60 N.Y.2d 987 (1983)
State of New York, Appellant,
v.
Earl H. Lundin et al., Defendants, and William B. Heller et al., Respondents.
Penn York Construction Corp., as Successor to Foster-Lipkins Corp., et al., Third-Party Plaintiffs-Respondents,
v.
Peter Bratti Associates, Inc., et al., Third-Party Defendants-Respondents.
Court of Appeals of the State of New York.
Argued October 18, 1983.
Decided December 1, 1983.
Robert Abrams, Attorney-General (Richard J. Dorsey and Peter H. Schiff of counsel), for appellant.
Nancy Kilson and Edward N. Costikyan for William B. Heller, respondent.
James L. Fischer for Robert L. Thorson and another, respondents.
Frederick Cohen and Andrea Popik Taber for Penn York Construction Corp. and others, defendants and third-party plaintiffs-respondents.
Denis B. Frind for Peter Bratti Associates, Inc., third-party defendant-respondent.
Donald P. Ford, Jr., for S. R. Beltrone, Inc., third-party defendant-respondent.
Michael S. Torre and Lester M. A. Gulitz for Georgia Marble Company, third-party defendant-respondent.
Alvin Goldstein for George A. Fuller Company, third-party defendant-respondent.
Chief Judge COOKE and Judges JONES, WACHTLER, MEYER, SIMONS and KAYE concur; Judge JASEN dissents and votes to reverse in an opinion.
*989 MEMORANDUM.
The order of the Appellate Division should be affirmed, with costs.
In a suit by a construction project owner against a general contractor and architect for defective construction and design, the cause of action generally accrues upon the completion of construction, meaning completion of the actual physical work. Application of that well-established principle cannot be avoided in this case by the two arguments advanced by appellant, the owner.
First, for Statute of Limitations purposes the date of the final certificate is not controlling. In the contract before us, responsibility for issuance of the final certificate rested with the owner, which sets this case apart from Board of Educ. of Tri-Valley Cent. School Dist. v Celotex Corp. (88 AD2d 713, affd 58 N.Y.2d 684). Where, as in Tri-Valley, the contract requires the architect to conduct inspections to determine completion dates and issue a final certificate, issuance of that certificate represents a significant contractual right of the owner and concomitant obligation of the architect. The architect's issuance of the certificate marks the completion of its performance and the point when the Statute of Limitations starts to run for a breach of its contractual undertaking. However, that same result does not obtain when the owner itself controls issuance of the final certificate. The final certificate in such circumstances may indicate the owner's acceptance of the work for purposes of contractual guarantees or equitable price adjustments, but it does not represent completion of the contractual obligations of the architect or general contractor for purposes of triggering the Statute of Limitations.
Second, construction may be complete even though incidental matters relating to the project remain open. Continuation of the owner's relationship with the architect and contractor beyond July 31, 1973  the key Statute of Limitations date  will not of itself serve to extend construction completion. With respect to the architect, the *990 ongoing relationship related to postconstruction price negotiations, and not performance of its contractual duties. There is no indication in this record that the architect was asked to participate in any final inspection, and such inspection was in any event the responsibility of the owner's project manager. While the architect submitted a bill during 1974 for unspecified services in the amount of $263.58, given the magnitude of the project and the other undisputed facts such a minimal amount of work, even if performed after July, 1973, could not alter the fact that the project was demonstrably complete before July, 1973.
Similarly, with respect to the contractor, the relationship after July, 1973 concerned prices to be paid for work already completed and not further construction. While the amount of $175 worth of interior trim on the project was held open beyond July, 1973, this did not reflect a lack of construction completion but related to the process for making equitable adjustments. Appellant emphasizes that on certain forms the contractor indicated that final payroll periods for itself and its subcontractors ended on dates after July 31, 1973. These forms however, do not specify that any work was actually done after July 31, 1973, and there is no evidence that any work was done; no amounts are charged to appellant on these forms. Finally, appellant argues that the contractor did not certify the change order work as 100% complete until Payment Application No. 78, which covered the period ending July 31, 1973, six years to the day before the summons was served on the contractor. But the previous application for payment, covering a period ending May 15, 1973 (No. 77), indicated that the change order work was already 99% complete, leaving only a small amount which was done between May 15 and July 31.[*]
To be measured against these arguments are the uncontested facts that long prior to July, 1973 appellant had fully occupied the building in suit, it had assumed responsibility for building security, and it had permitted fire and *991 liability insurance carried by the contractor to be canceled. Given these facts, it is significant that in all the volumes of affidavits and exhibits submitted to us, including the affidavit of appellant's assistant construction director fully familiar with the project, there is no mention of any actual ongoing construction after July 31, but only paperwork relating to price adjustments and other incidental matters from which it is surmised that construction continued.
On the point that construction was complete before July 31, 1973, there is no genuine triable issue of fact.
JASEN, J. (dissenting).
The majority today holds that the State's claim arising out of the allegedly defective construction of the Empire State Plaza in Albany is time barred, as a matter of law, even though the record is fraught with evidence to the contrary. In other words, the result of today's holding is that the State is not entitled to its day in court because the majority finds that it is beyond dispute that the construction was completed more than six years prior to the State's commencement of this action, despite the evidence in the record  much of it prepared and certified by defendants' architects and contractor  that the construction was actually incomplete on the majority's estimated date of completion and, in fact, continued for more than one year thereafter. I would reverse the order of the Appellate Division granting defendants' motions for summary judgment and would remit this case to Supreme Court for a hearing on the facts to determine the date on which construction of the Empire State Plaza was actually completed.
The State brought this action on July 31, 1979 to recover damages for breach of contract, specifically alleging improper design, installation and supervision thereof of the marble facing to the Swan Street building. Defendants are the architects whose contractual obligations included the planning, design and supervision of the installation of the marble; the successor to the primary contractor whose duties included attaching the marble; and the sureties who issued performance bonds with the contractor as principal. Defendants contend that the construction of the Plaza had been completed more than six years prior to the commencement of this action and, consequently, the Statute of Limitations *992 had expired. The State, on the other hand, argues that its cause of action did not accrue until the final certificate of acceptance was issued and, in any event, work under the contract actually continued for a considerable time after defendants' alleged completion date.
Supreme Court granted defendants' motions for summary judgment, holding that the construction was completed at some undetermined time prior to July 31, 1973. The Appellate Division affirmed, again without determining a date of completion, and the majority today does likewise, holding that there is no evidence in the record that construction continued beyond July 31, 1973. While I agree that the mere formal issuance of a final certificate of acceptance by the State is not dispositive in this case, I also believe that there is more than sufficient evidence in the record supporting the State's contention and thereby raising a question of fact whether construction continued on or after July 31, 1973 and, consequently, whether the State's action was timely.
As we have consistently repeated, summary judgment is a drastic remedy and should not be granted whenever there is "any doubt" as to the existence of a factual issue (Millerton Agway Coop. v Briarcliff Farms, 17 N.Y.2d 57, 61; Sillman v Twentieth Century-Fox Film Corp., 3 N.Y.2d 395, 404) or whenever a factual issue is "arguable" (Barrett v Jacobs, 255 N.Y. 520, 522) or whenever the court must engage in factual "issue-determination" rather than "issue-finding" (Sillman v Twentieth Century-Fox Film Corp., supra, at p 404). Inasmuch as summary judgment was granted below, the only question to be resolved on this appeal is whether there may be found in the papers presented on the motion a material and triable issue of fact. In my view, such an issue is clearly presented in the record with regard to the completion date of the construction and, therefore, summary judgment is improper.
It is settled, as the majority so states, that a cause of action for defective construction and design accrues upon actual physical completion of the work (Sears, Roebuck & Co. v Enco Assoc., 43 N.Y.2d 389, 394; Sosnow v Paul, 36 N.Y.2d 780, 782) and is governed by the six-year Statute of Limitations (CPLR 213, subd 2; Sears, Roebuck & Co. v Enco Assoc., supra, at p 395; *993 Matter of Paver & Wildfoerster [Catholic High School Assn.], 38 N.Y.2d 669, 673). This action having been commenced on July 31, 1979 would, therefore, be barred only if physical construction of the Empire State Plaza had actually been complete prior to July 31, 1973. A review of the record clearly discloses evidence that actual physical construction continued for some time thereafter.
As late as December 9, 1974, the architects entered into a fifth supplemental agreement with the State providing for additional compensation to be paid to the architects for additional supervisory services which were in excess of the previously estimated requirements. Moreover, this agreement was specifically made a part of the original contract and did not constitute a new arrangement between the parties. Its language is clear that "the Original Agreement, the First Supplemental Agreement and the Second, Third and Fourth Supplemental Agreements shall in all respects be and remain in full force and effect and binding upon the parties." Apparently pursuant to that agreement, the architects submitted a voucher on December 27, 1974 for payment for supervisory "services rendered * * * August 5, 1974  November 10, 1974." In the "Payroll Detail" submitted with that voucher, the architects specified the name of their representative who performed the services, the rate and the total amount charged, and the number of hours worked for each of the four two-week periods involved. The architects specified, for instance, that they rendered 13 hours of supervisory services for the two-week period ending October 2, 1974 and five and one-half additional hours for the period ending November 10, 1974. Each of these time periods is, of course, more than one year subsequent to the majority's estimated date of completion and considerably less than six years prior to the commencement of the State's action. Additionally, notwithstanding the majority's labeling of the total amount charged as nominal, it is significant that the $263 was payment solely for supervisory services. Indeed, something must have been supervised. The voucher thus prepared and submitted by the architects clearly evinces not only the continuing supervisory work on the construction project, but it also necessarily indicates the presence of some *994 other ongoing work being supervised as late as November 10, 1974. In fact, correspondence between the State, the architects and the contractor as late as April 16, 1973 indicates that work still remained to be performed and supervised involving the proper attachment of the marble facing.
With regard to the primary contractor and its subcontractors, the evidence is even more substantial. The record contains affidavits executed by the contractor and its subcontractors which support the State's contention that those parties were performing construction work well beyond July 31, 1973. An affidavit prepared and submitted pursuant to section 220-a of the Labor Law ("labor affidavit") by the contractor on May 10, 1976 certifies that "work related to concrete placement, carpentry and masonry" was performed during the "payroll period which ended December 31, 1973", and this is corroborated by the "Summary of Subcontractors" dated May 9, 1977, also prepared by the contractor, which likewise specifies December 31, 1973 as the "date last worked" on "concrete work". Though the exact amount of work actually performed on or after July 31, 1973 is unstated, the "job progress" report submitted by the contractor on July 1, 1976 indicates that the total concrete work in question amounted to several millions of dollars.
Additionally, a labor affidavit prepared by subcontractor Peter Bratti Associates, Inc., on May 3, 1976, certifies that "tile, marble, terrazzo and granite" work was performed during the period ending December 31, 1975, and again that is confirmed by the contractor's "Summary of Subcontractors" which specifies December 31, 1975 as the "date last worked". The total work there involved also amounted to several millions of dollars.
Another labor affidavit prepared by subcontractor Samuel Kirschner & Sons certifies that contract work on the Swan Street building was performed during the period ending April 30, 1976, and again that date is corroborated by the contractor's "Summary of Subcontractors" as the "date last worked" and is indicated to have involved a total of $260,000 worth of work.
Yet another labor affidavit, this one prepared by subcontractor Hudson Schatz Painting Co., Inc., certifies that *995 painting work on the Swan Street building was performed during the period ending June 30, 1976, and this, too, is confirmed by the contractor's "Summary of Subcontractors" and involved a $1,000 project.
In addition to the foregoing affidavits and allied papers, the record contains several applications for payment which likewise provide evidence that the construction work had not been completed prior to July 31, 1973, but continued on and well beyond that date. On July 31, 1973, the contractor prepared a certified application for payment for work performed during the "work period ending July 31, 1973" and specified in the attached schedule of "approved change orders" that "100"% of the related compensation had been "earned" since the previous work period (May 15, 1973) and amounted to more than $50,000  excluding equitable adjustments and reduction of the retainage.
On May 21, 1974, the contractor prepared another certified application for payment, this time stating that $163,000 worth of work was performed during the work period ending on that date and specified in the attached schedule of "approved change orders" that "100"% of that amount was "earned" subsequent to the last period (i.e., July 31, 1973).
On June 30, 1975, the contractor certified in yet another application for payment that $25,000 worth of work had been performed during the work period ending on that date, and again specified that "100"% of the amount had been "earned" since the previous work period (i.e., November 30, 1974). And, once more, on May 9, 1977, still another amount of work, albeit only $175 worth, was certified by the contractor to have been earned during the work period ending July 1, 1976.
None of the afore-mentioned amounts earned include reductions in retainage or equitable adjustments which were also indicated on each of the applications for payment. Rather, all of the foregoing represent work which the contractor certified actually to have been performed during the respective periods specified. In each instance, the time period was specified to be on or subsequent to July 31, 1973, thereby supporting the State's contention that the construction was indeed not complete by that time. *996 Moreover, the contractor did not even submit a request for final payment until almost three years thereafter, on April 8, 1976.
Finally, all of the foregoing affidavits, certificates and other papers prepared by the architects, contractor and subcontractors are further supported in the record by affidavits submitted by the State in opposition to defendants' motions for summary judgment. The affidavits of two individuals fully familiar with the facts and circumstances surrounding this claim, John C. Byron, the assistant director of South Mall Construction for the State of New York, and Carlo O. D'Arcangelis, former equitable adjustment claims analyst for the State, both extensively corroborate the contents of the papers just outlined.
From the foregoing, it is clear to me that there is adequate evidence in the record, not only of incidental work or postconstruction price negotiation, but of actual physical performance of contractual duties on and subsequent to July 31, 1973, to warrant a hearing. Moreover, the monetary amounts and the related work which are evinced in these papers are hardly minimal and clearly not limited to mere adjustments of compensation claimed.[*] No amount of speculation can erase this evidence from the record  most of it prepared by the defendants contractor and subcontractors themselves  or dissolve the question of fact which has been raised. To the extent that the record may also disclose some contrary evidence, that simply denotes that a factual issue has been presented; it does not form the basis for summary judgment. Consequently, a question of fact exists whether the actual physical construction was completed by July 31, 1973, thereby time-barring the State's action. That genuine and triable issue having been raised on the record before us, defendants' motions for summary judgment should not have been granted.
Order affirmed, with costs, in a memorandum.
NOTES
[*] The dissent relies on what we would characterize as payment applications, concluding that they represent work done after July 31, 1973. But the differences in the amounts listed on the applications are explained by equitable adjustments, supplemental agreements and retainage  all of which concerned additional moneys to be paid rather than work performed.
[*] Contrary to the statement contained in the footnote of the majority's memorandum, I do not rely on any equitable adjustments or retainage; rather, all the amounts relied on in the payment application expressly reflect compensation "100"% "earned" subsequent to the prior payroll periods listed.